IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

CHRISTOPHER JONES, *et al.*,    )
                                )
            Plaintiffs,         )
                                )
v.                              )          Case No. 7:15-cv-00661-TMP
                                )
SCOTT DAVIS CHIP MILL, *et al.*, )
                                )
            Defendants.         )

## MEMORANDUM OPINION

Pending before the court are multiple motions for summary judgment. (Docs. 69, 74, and 76). The motions have been fully briefed, and the parties have consented to dispositive jurisdiction by a United States magistrate judge in accordance with 28 U.S.C. § 636(c). Accordingly, the undersigned enters the following Memorandum Opinion.

## I.    PROCEDURAL HISTORY

Plaintiffs Kenneth Jackson ("Jackson") and Christopher Jones ("Jones") (together "plaintiffs") filed the original Complaint in this action on April 21, 2015, and named as defendants Scott Davis Chip Mill ("the Chip Mill"), Brett Davis ("Davis"), McMillan Trucking, Mike McMillan ("McMillan"), and Jamie Brasher ("Brasher"). (Doc. 1). Defendants Davis and the Chip Mill filed a Motion to

Dismiss (doc. 6), which was followed by a Motion to Dismiss filed by defendants Brasher, McMillan, and McMillan Trucking (doc. 9). On June 24, 2015, the plaintiffs moved to file an Amended Complaint. The motion was granted, and the plaintiffs filed an Amended Complaint on July 2, 2015. (Doc. 24). Due to the filing of the Amended Complaint, the previous Motions to Dismiss were denied as moot. (Doc. 25).

The parties consented to dispositive jurisdiction by a magistrate judge on July 7, 2015. (Doc. 26). The court filed an Initial Order in the case on the following day. (Doc. 27). On July 16, 2015, Motions to Dismiss were filed by defendant Brasher (doc. 28) and defendants McMillan and McMillan Trucking (doc. 30). On the same day, defendants Davis and the Chip Mill filed an Answer to the Amended Complaint.[1] (Doc. 31). The court entered an order granting in part and denying in part the Motions to Dismiss (docs. 28, 30), but allowing the plaintiffs to file a Second Amended Complaint "to supply any additional factual or missing allegations necessary to state claims in this action." (Doc. 42, p. 37). The plaintiffs filed a Second Amended Complaint on February 4, 2016. (Doc. 45). The court entered a Memorandum Opinion and Order determining that the following claims remain pending:

---

[1] Defendants Davis and the Chip Mill attempted to file a Motion to Dismiss Counts III through VIII of the Amended Complaint in January of 2016, but the motion was stricken by the court because, according to Rule 12 of the Federal Rules of Civil Procedure, a motion under 12(b)(6) must be made before the responsive pleading, if a responsive pleading is allowed.

- As to defendants Davis and the Chip Mill: Count One – Race Discrimination in Contract under 42 U.S.C. § 1981; Count Two – Civil Conspiracy; Count Three – Racketeering; Count Four – Violation of Civil Rights under 42 U.S.C. § 1982; Count Five – Conspiracy to Deprive the Plaintiffs of Civil Rights under 42 U.S.C. § 1985; Count Six – Unjust Enrichment; and Count Seven – Fraud and Deceit.

- As to defendants McMillan and McMillan Trucking: Count One – Race Discrimination in Contract under 42 U.S.C. § 1981; Count Two – Civil Conspiracy; and Count Three – Racketeering.

- As to defendant Brasher – Count One – Race Discrimination in Contract under 42 U.S.C. § 1981; Count Two – Civil Conspiracy; Count Three – Racketeering; and Count Six – Unjust Enrichment *only* as to plaintiff Jackson. (Doc. 56, pp. 17-18).

Following entry of the court's order, defendants Davis and the Chip Mill filed a Motion to Dismiss Counts IV through VII (doc. 57), which the court denied. (Doc. 58). Defendant Brasher filed an Answer to the Second Amended Complaint on July 13, 2016. (Doc. 59). Defendants McMillan and McMillan Trucking filed an Answer to the Second Amended Complaint on July 21, 2016, followed by an Amended Answer on August 4, 2016. (Docs. 61, 64). Defendants Davis and the

Chip Mill filed an Answer to the Second Amended Complaint on August 4, 2016. (Doc. 63).

After the parties notified the court of their willingness to engage in mediation, the court, on December 1, 2016, ordered the parties to proceed with mediation through a mediator of their choice. (Doc. 66). Mediation proved unsuccessful, however, and defendants Davis and the Chip Mill filed a Motion for Summary Judgment on December 19, 2016. (Doc. 69). The court held a telephone conference with the parties and set a schedule for the filing and briefing of motions for summary judgment by the other parties. Defendant Brasher filed a Motion for Summary Judgment on January 13, 2017. (Doc. 74). Defendants McMillan and McMillan Trucking filed a Motion for Summary Judgment on January 18, 2017. (Doc. 76). The plaintiffs filed a Response in opposition to the pending Motions for Summary Judgment on February 8, 2017. (Doc. 79). The plaintiffs' Response was met with Motions to Strike by defendants Brasher (doc. 81) and McMillan and McMillan Trucking (doc. 80) and motions to join those Motions to Strike by defendants Davis and the Chip Mill (docs. 84, 85). Reply briefs were filed by defendant Brasher (doc. 82) and defendants McMillan and McMillan Trucking (doc. 83) on February 22, 2017. Defendants Davis and the Chip Mill did not file a reply brief.

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R.

Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact. Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communications, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

### III. FACTS

For purposes of summary judgment the courts are directed to view the facts in the light most favorable to the non-moving party. However, in the instant case, portions of the non-moving plaintiffs' Statement of Facts have been stricken and will not be considered in this Memorandum Opinion. (<u>See</u> doc. 90). Accordingly, the following facts are relevant to the instant Motions for Summary Judgment.

Plaintiffs Jones and Jackson, during the relevant period, worked in the trucking business in the state of Alabama. Plaintiffs are African American. Jones is the owner and operator of Jones Trucking in Perry County, Alabama, and Jackson is the owner and operator of Jackson Transportation, LLC, in Wilcox County, Alabama.

Defendant Davis is the owner and operator of the defendant Chip Mill, an incorporated entity in Bibb County, Alabama. Defendant McMillan is the owner and operator of defendant McMillan Trucking, also an incorporated entity in Bibb County, Alabama. Defendant Brasher, during the relevant time period, was an employee of McMillan Trucking.

During the relevant time period, the Chip Mill did not have an employee on staff to assign loads for drivers to haul. Although Brasher was not an employee of the Chip Mill, he was given the responsibility by Scott Davis, the previous owner of the Chip Mill, to assign particular loads of wood chips from the Chip Mill to

trucking companies and drivers. After Scott Davis's death, (Brett) Davis took over the Chip Mill. He began having daily discussions with Brasher to discuss loads and to make sure the loading and hauling process ran smoothly. Brasher and the Chip Mill had a policy of placing trucking companies and drivers on a "cut off" list for the week when there were not enough loads to assign to everyone.

Drivers began receiving loads from the Chip Mill to haul to Beaumont, Texas ("Texas"), in April of 2014, with virtually no limit imposed by the Chip Mill on the number of loads to Texas. During July and August of 2014, most of Jones's and Jackson's trucking business involved hauling wood chips from the Chip Mill to Texas. Jones hauled loads from the Chip Mill under Jones Trucking, a sole proprietorship, while Jackson hauled loads assigned to his company, Jackson Transportation, LLC.[2] McMillan Trucking was hauling wood chips from the Chip Mill to local destination; McMillan Trucking, however, did not haul to Texas.

When the number of loads to Texas began to decrease, Brasher began asking African American drivers to pay him $100 per load. Trucking companies and drivers who paid would receive preference on loads to Texas; in contrast, drivers

---

[2]     See doc. 79-2, p. 156, ll. 14-18 ("I own Jackson Transportation. Jackson Transportation is in that mill down there because of me signing the paper and giving them my W-9 and giving them my certificate of title, insurance down there."); see also Second Amd. Cmplt. ¶ 8; doc. 79-2, p. 58, ll. 19-23 – p. 59, ll. 1-5 ("And when they give you the – the only form of contract or whatever that was, it wasn't a contract, they give you a list of all of the places that you run. Then you have at the end of that list, he got a load number for Jackson Transportation. If it's Alabama River, load number one, you punch in Jackson -- put my code in, Jackson, get that load going to the River. And number two, Naola, number two, and it went right down the line. . . .).

who did not pay would receive loads to Texas only after paying drivers received their loads and if loads remained to be assigned. Jackson described the first time that Brasher asked him to pay:

> When I got into the office that morning, the scale house, [Brasher] said KJ. That's what he always says. How many loads you going to need this week? I said I got three trucks running. He said ten? Okay. That is going to be a hundred dollars a load, just like that. I laughed at him. I laughed. I said a hundred dollars a load. Punching the numbers, punching the computer. He goes no, no, no, I'm serious, I'm serious, I'm serious.
>
> I said you serious, a hundred dollars a load? He said yeah. He said yeah. Brett said that it's okay for me to do this. . . I said when did this start? He said well, it started a while ago, but this Texas is going to be a hundred dollars a load if you are going to run, that's what it is going to be. If you want hundred dollars – if you want ten loads, it's going to be a thousand dollars.

(Doc. 75-2, p. 103, ll. 22-23 – p. 104, ll. 1-20).

Jones recalls Brasher saying "that we was [sic] going to have start paying. We was [sic] going to have to – well, we was [sic] going to have to start paying a hundred dollars a load going to Texas. . . . [meaning] the drivers." (Doc. 75-6, p. 75, ll. 1-7). Anderson states that Brasher called him on his phone and said that "the majority of loads [were] already taken . . . . And if you wanted the load, it was going to be a hundred dollars and how many loads do you want?" (Doc. 75-12, p. 16, ll. 1-5). In all, approximately seven truckers or trucking entities, operated by

both African Americans and white, paid Brasher $100 per load to secure continued preference on loads to Texas.[3]  Brasher asked for payment only from African American truckers.  Although he would accept payment or trade from white truckers, he did not ask for payment from them.[4]  At least some African American drivers voluntarily approached Brasher and offered to pay $100 per load.[5]

Though Brasher benefitted from the policy, the idea originated with Davis when Brasher asked to go on Davis' "payroll."  (Doc. 75-7, p. 23 ll. 1-23 – p. 24 ll. 1-24).  Davis suggested to Brasher the idea of brokering loads; according to Brasher, Davis asked him if he had "ever thought about brokering the loads out." (Doc. 75-7, p. 23, ll. 20-21).  Jones videotaped Brasher admitting that Davis had given him the idea to ask for the $100-per-load payment.  Brasher, however, was not a licensed broker, so he considered the $100 per load "no more than a tip." (Doc. 79-3, p. 69, ll. 1-23 – p. 70 ll. 1-11).  Previously, Brasher would receive tips when he saved a load to haul over the weekend for a driver who had issues during

---

[3]      See doc. 75-7 (Brasher), p. 28, ll. 17-22; doc. 75-12 (Anderson), p. 13, ll. 12-23 – p. 14, ll. 1-11; doc. 75-14 (Howard), p. 13, ll. 6-23 – p. 14, ll. 1-18, p. 48, ll. 9-23; doc. 75-15 (Powell), p. 21, ll. 21-23 – p. 24, l. 1; doc. 75-16 (Pruitt), p. 42, ll. 8-23 – p. 43, ll. 1-19; doc. 75-8 (Loveless), p. 2, ¶¶ 6-7; doc. 75-9 (Spivey), p. 21, ll. 2-23 – p. 22, ll. 1-2, p. 32, ll. 2-9.

[4]      Dewayne Loveless ("Loveless"), a white driver for his own trucking company, L&L Logging, voluntarily approached Brasher and offered to pay him $100 per load to secure continued preference for loads to Texas.  William Harold Spivey, III ("Spivey"), a white driver for his own trucking company, Spivey Industrial, voluntarily approached Brasher and offered him a membership in Spivey's hunting club worth $2,000 in lieu of the $100-per-load payment to secure continued preference for loads to Texas.

[5]      Howard, an African-American driver, voluntarily paid $100 per load to Brasher.  (Doc. 75-14, p. 14, ll. 7-18).

the week which prevented that driver from hauling. He would receive, at most, a few tips of $10 to $20 per year. Davis, McMillan, and McMillan Trucking never received any proceeds from the $100-per-load payments that Brasher received. In fact, McMillan was not aware of the scheme, even though some of his drivers heard about Brasher's scheme.

After learning of the $100-per-load scheme and that Davis was aware of Brasher's actions, the plaintiffs, along with Donald Anderson, another African American trucker, met with Davis at the Sawmeal Restaurant to discuss the matter ("the meeting"). When the plaintiffs spoke to Davis about ending the $100-per-load scheme, Davis indicated to them that he "needed" Brasher and was not going to terminate his employment. (Doc. 79-2, p. 131, ll. 15-23 – p. 132 ll.1-17). Davis did not tell the plaintiffs or Anderson that he had suggested the payment system to Brasher, but he did tell them that he would investigate the matter and report back to them. Neither the plaintiffs nor Anderson, however, complained or otherwise suggested at the meeting that Brasher's payment demands were racially motivated.

Davis spoke with McMillan about the $100-per-load payments that Brasher asked for and received either before or after his meeting with the plaintiffs.[6] After the meeting, and as the plaintiffs and Anderson were sitting in a car together,

---

[6]     The parties dispute whether Davis spoke to McMillan before or after the meeting; however, the timing of the discussion is immaterial to the resolution of the motions for summary judgment.

Brasher contacted Anderson and informed him that all three were "cut off" from loads to Texas. Brasher placed the plaintiffs and Anderson on the "cut off" list because they complained to Davis about the $100-per-load scheme. Brasher claims he "was really hurt that [they] had went behind [his] back and did that. All [they] had to do was say [they] didn't want to pay [him] no more." (Doc. 75-7, p. 33, ll. 17-20). Jones and Jackson confirmed that they were placed on the "cut off" list after the meeting, yet neither spoke to Brasher or Davis about being taken off of the "cut off" list. The $100-per-load scheme ended immediately after the meeting when McMillan told Brasher to stop accepting payments from drivers. Furthermore, Brasher never accepted another payment, asserting he "never did it again." (Doc. 75-7, p. 33, ll. 3-4). Davis never spoke to the plaintiffs again, however, about resolving the situation as promised. The loads to Texas ended by the end of September 2014.

In order to obtain loads to Texas, Jackson paid Brasher approximately $2,900.00, in total.[7] Although Jones refused to pay Brasher for loads, he still received loads to Texas before the meeting. However, Jones was denied at least one load after both he and Jackson were "cut off" from receiving loads from the Chip Mill. Jones observed Cedrick Jones[8] hauling a load to Texas after (Chris)

---

[7]   Specifically, Jackson made three cash payments of $1,000, $900, and $1,000 to Brasher over a three week span in order to secure continued preference on loads before he was "cut off."

[8]   Cedrick Jones is an African-American driver with C.M. Jones Trucking.

Jones and Jackson were "cut off" by Brasher.  However, only Jackson and Jones indicated that Brasher implement the $100-per-load scheme due to any racial animus.[9]  Jackson believes that Brasher harbored racial animus because Brasher "charge[d] only black folks and not white folks" for loads.  (Doc. 75-2, p. 266, ll. 18-19).  He states that "[if Brasher] did it to the whites, he was wrong.  But if didn't do it to them, he is twice as wrong.  When they come and say – when they tell me that no, we are not paying, that's a slap in the face to me . . . ."  (Doc. 75-2, p. 263, ll. 15-19).   Jackson, however, claims that "[w]e would never have been here if wasn't for [money.]"  (Doc. 75-2, p. 141, ll. 8-9)

## IV.  DISCUSSION

The plaintiffs assert seven claims in their Amended Complaint.  Some of the claims were dismissed previously on motions to dismiss filed by some of the defendants.  Therefore, not every claim is applicable to each defendant.  The court will address each claim individually, as it may apply to each defendant.

### A.  Count One: 42 U.S.C. § 1981 – Race Discrimination in Contract and Retaliation

#### 1.  Jackson's Standing to Bring § 1981 Claim

Although Count One remains pending against all defendants, Jackson does not have standing to maintain a claim under § 1981.  In <u>Domino's Pizza, Inc. v.</u>

---

[9]      Anderson, Howard, Powell, and Pruitt, all African-American drivers, testified they do not believe that Brasher was motivated racial animus.  (Doc. 75-12, p. 53, ll. 1-23 – p.54, l. 1; doc. 75-14, p. 49, 1. 23 – p. 50, ll. 1-15; doc. 75-15, p. 41, ll. 16-23; doc. 75-16, p. 79, ll. 5-8).

McDonald, the sole shareholder and president of a Nevada corporation brought a cause of action under § 1981 against Domino's Pizza when Domino's Pizza breached a contract with his corporation due to racial animus. 546 U.S. 470, 472-73 (2006). He argued that he had "a cause of action because he 'made and enforced contracts' for" his corporation. Id. at 475. The Supreme Court disagreed, finding that McDonald "[could ]not maintain a cause of action under § 1981 unless he ha[d] . . . rights under the . . . contract that he wish[ed] 'to make and enforce.'" Id. at 479-80. The Court reasoned that "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's." Id. at 480. While "McDonald's complaint [did] identify a contractual relationship, the one between Domino's and [plaintiff's corporation,] . . . it is fundamental corporation and agency law–indeed, it can be said to be the whole purpose of corporation and agency law–that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." Id. at 477.

The defendants argue that Domino's Pizza controls, and therefore Jackson lacks standing to bring a § 1981 claim as an individual. Jackson, however, asserts that he contracted with the Chip Mill in his own name, as if it were a sole proprietorship. Furthermore, Jackson attempts to argue that a limited liability company ("LLC") is different from a corporation, which in turn makes Domino's

*Pizza* distinguishable. In Jackson's view, Jackson Transportation, LLC, "in all relevant aspects resembles a sole proprietorship." (Doc. 79, pp. 20-21).

Jackson's strained argument that Jackson Transportation, LLC, is different from a corporation, which in turn makes <u>Domino's Pizza</u> distinguishable, is unavailing. An LLC is more like a corporation than a sole proprietorship for the purposes of standing to bring a § 1981 claim. As the Supreme Court explained, "the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." <u>Id.</u> at 477. Similarly, "in general, members of an LLC are not proper parties to proceedings against the LLC, . . . and members are not liable for judgments against the LLC . . . ." <u>Filo Am., Inc. v. Olhoss Trading Co.</u>, 321 F. Supp. 2d 1266, 1268 (M.D. Ala. 2004). Here, a member of an LLC may not bring a § 1981 claim for an alleged contract impairment suffered by the LLC for the same reason an officer/shareholder in a corporation could not maintain a cause of action under § 1981 for an alleged contract impairment in <u>Domino's Pizza</u>.

It is undisputed that Jackson is a member, owner, and operator of Jackson Transportation, LLC, which was formed on March 3, 2003, and has existed continuously since that date. During all relevant times, Jackson Transportation,

LLC, hauled wood chips from the Chip Mill to Texas, not Jackson individually.[10]

However, Jackson Transportation, LLC, was not named a party to this action. As

such, Jackson is not the proper party and lacks standing to maintain a claim under

§ 1981 because his ability "to make or enforce a contract" in his own name was not

impaired. Summary judgment is due to be GRANTED for any claim of

discrimination or retaliation brought by Jackson under § 1981 as to each defendant.

### 2. Jones' § 1981 Claim

#### a. Pre-Meeting § 1981 Claim

To support a claim brought pursuant to 42 U.S.C. § 1981, the plaintiff must

allege and make a *prima facie* showing that "(1) he or she is a member of a racial

minority; (2) the defendant had intent to discriminate on the basis of race; and (3)

the discrimination concerned one or more activities enumerated in the statute."

Rutstein v. Avis Rent-A-Car Systems, Inc., 211 F.3d 1228, 1235 (11th Cir. 2000).

The activities enumerated in the statute are the rights to "make and enforce

contracts, to sue, be parties, give evidence, and to the full and equal protection of

---

[10]     The files maintained by the Chip Mill indicate that Jackson Transportation was the entity
hauling the wood chips.  See Doc. 79-2, p. 156, ll. 14-18 ("I own Jackson Transportation.
Jackson Transportation is in that mill down there because of me signing the paper and giving
them my W-9 and giving them my certificate of title, insurance down there."); see also Second
Amd. Cmplt. ¶ 8.  Even further, loads were issued to "Jackson Transportation."  See Doc. 79-2,
p. 58, ll. 19-23 – p. 59, ll. 1-5 ("And when they give you the – the only form of contract or
whatever that was, it wasn't a contract, they give you a list of all of the places that you run.
Then you have at the end of that list, he got a load number for Jackson Transportation. If it's Alabama
River, load number one, you punch in Jackson -- put my code in, Jackson, get that load going to
the River. And number two, Naola, number two, and it went right down the line. . . .).

all laws . . . ." 42 U.S.C. § 1981. "[T]he term 'make and enforce contracts' includes making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privilege, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "To state a claim under § 1981 for interference with a right to contract, 'a plaintiff must identify an impaired contractual relationship under which the plaintiff has rights.'" Jimenez v. Wellstar Health System, 596 F.3d 1304, 1308 (11th Cir. 2010) (quoting Kinnon v. Arcoub, Gopman & Assocs., 490 F.3d 886, 890 (11th Cir. 2007)).

The second prong of the test dictates that "[a] showing of disparate impact through a neutral practice [alone] is insufficient to prove a § 1981 violation because proof of discriminatory intent is essential." Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999). "To show that a defendant acted with discriminatory purpose–i.e., element 2 of the § 1981 cause of action–a plaintiff must present either (1) statistical proof of a pattern of discrimination, (2) direct evidence of discrimination, which consists of evidence which, if believed, would prove the existence of discrimination without inference or presumption, or (3) circumstantial evidence of discriminatory intent using the framework established in

McDonnell Douglas." Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1315-16 (M.D. Ala. 2010).[11]

Under the McDonnell Douglas framework for § 1981 non-employment claims, the plaintiff must establish a *prima facie* case to create an inference of discrimination if direct evidence does not exist. Benton, 230 F. Supp. 2d at 1369. Once the plaintiff successfully establishes a *prima facie* case, "then the burden shifts to the defendant to offer legitimate, non-discriminatory reasons for its actions." Brooks v. Cty. Comm'n of Jefferson Cty, Ala., 446 F.3d 1160, 1162 (11th Cir. 2006). "If the defendant offers legitimate, nondiscriminatory reasons, then the burden shifts back to the plaintiff to rebut those reasons and show that they are merely pretext for discrimination." Id. Despite these shifting burdens, "the ultimate burden of persuading the trier of fact that the [defendant] intentionally discriminated against the [plaintiff] remains at all times with the plaintiff." Id. (internal quotation marks omitted).

---

[11]    For non-employment claims brought pursuant to § 1981, the Eleventh Circuit has yet to articulate a *prima facie* test to establish discriminatory intent; however, in Kinnon, 490 F.3d at 893, the Eleventh Circuit upheld a grant of summary judgment by the district court, which applied the "burden-shifting framework" established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also Benton v. Cousins Properties, Inc., 230 F. Supp. 2d 1351, 1370 (N.D. Ga. 2002) ("There is little case authority concerning the requirements of a *prima facie* case for cases alleging racial discrimination in the context of a commercial business dispute, where there is no employer/employee relationship."). Our sister courts have extended the McDonnell Douglas framework to non-employment § 1981 claims, and we will do the same. See Long v. Aronov Realty Mgmt., Inc., 645 F. Supp. 2d 1008, 1020-21 (M.D. Ala. 2009); Jackson v. Waffle House, Inc., 413 F. Supp. 2d 1338, 1354-56 (N.D. Ga. 2006); Benton, 230 F. Supp. 2d at 1370; see also Flournoy v. CML-GA WB, LLC, No. CV 114-161, 2015 WL 8542765, at *3 (S.D. Ga. Dec. 10, 2015).

Although neither party has delineated two possible § 1981 claims, the court construes the factual record to establish two possible violations of § 1981. The first possible violation of § 1981 involves Brasher asking African American drivers for $100 per load to Texas and not asking the same of white drivers prior to the meeting. The second possible violation of § 1981 concerns Brasher denying Jones the opportunity to haul loads to Texas after the meeting, while allowing other drivers to continue to haul loads to Texas.

### i. Contract Impairment

The parties do not dispute that Jones is a member of a racial minority. Jones cannot, however, establish that the first possible violation of § 1981 involves a contract impairment. Defendants Brasher and McMillan Trucking argue that the plaintiffs did not have a contractual relationship with either the Chip Mill or McMillan Trucking nor did the plaintiffs have a right to keep hauling loads for the Chip Mill. Jones argues that he was "extorted economically on the basis of race" and that "[t]he defendants threatened to deprioritize the plaintiffs if they did not pay the money." (Doc. 79, pp. 12-13).

Prior to the meeting, Jones cannot show "that the allegedly discriminatory conduct concerned . . . the making, performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Benton, 230 F. Supp. 2d at 1370. In other words, he

cannot establish that he was denied, or Brasher impaired, his opportunity to contract with the Chip Mill to haul loads to Texas prior to the meeting. In fact, the record conclusively establishes that Jones was not denied a load to Texas during this period before the meeting. When asked if he "kn[ew] of any loads between the date [he] refused and August 25th that [he] missed out on because [he] refused to pay that hundred dollars," Jones answered "[n]o. I don't recall any loads that I missed during that time." (Doc. 75-6, p. 100, ll. 16-21).

    ii.   *Prima Facie* Case

It is clear from the evidence that there is neither direct evidence nor statistical proof of discrimination. Because of this, Jones must prove intent in accordance with <u>McDonnell Douglass</u>. To establish a *prima facie* case of discrimination under the <u>McDonnell Douglass</u> framework, the

> plaintiff must demonstrate the following elements . . . : (1) that she is a member of a protected class; (2) that the allegedly discriminatory conduct concerned . . . the making, performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship; and (3) that the defendants treated the plaintiff less favorably with regard to the allegedly discriminatory act than the defendants treated other similarly situated persons who were outside plaintiff's protected class.

<u>Id.</u> at 1370; <u>see also</u> <u>Flournoy</u>, 2015 WL 8542765, at *3. In other words, the plaintiff must "show an apt comparator of a different race who was not subjected

to the same harsh treatment with regard to the enforcement of a contract as was the plaintiff" to prove intent by circumstantial evidence.  Id.

Even assuming *arguendo* that Jones can point to a contract impairment prior to the meeting, Jones cannot establish a *prima facie* case of discriminatory intent by identifying a white comparator.  The defendants argue that Jones has failed to assert a *prima facie* case of discrimination against them.  However, the defendants argue that Jones must prove Brasher's intent to discriminate on the basis of race.  Defendants assert that "there is no evidence Brasher intentionally discriminated against Jones based on race, [and Jones] cannot identify a White comparator who was treated more favorably" (doc. 74, p. 3).

Jones argues that he was "extorted economically on the basis of race."  (Doc. 79, p. 12).  He alleges that the defendants "did not similarly threaten white drivers."  (Doc. 79, p. 13).  In other words, he argues that the plaintiffs' evidence reveals white comparators "from whom Brasher did not demand" the $100-per-load payment.  (Id.).  Specifically, Jones points to William Harold Spivey, III, and Dewayne Loveless as comparators who were not asked to pay $100 per load and who in fact voluntarily paid $100 per load to Brasher. Finally, Jones argues that the Chip Mill, Brett Davis, and McMillan Trucking are liable under a theory of agency and *respondeat superior*.

Jones cannot point to a sufficient white comparator.  African American and white drivers alike paid Brasher $100 per load to receive priority on loads to Texas.[12]  Furthermore, both African American and white drivers voluntarily paid Brasher to secure preference on loads to Texas.[13]  Most fatal to his § 1981 claim, however, is the absence of a white comparator who refused to pay for a load to Texas, yet who received more preferential treatment.  Jones refused to pay Brasher $100 per load.  Therefore, to establish a comparator, he must point to a white driver who also refused to pay but received more preferential treatment in the form of being assigned a load without paying Brasher.  He cannot, however, identify a white driver who ultimately refused to pay $100 per load, much less one who refused to pay and yet received a load.  Because the record is devoid of any white driver who did not pay $100 per load or who did not offer a tangible benefit worth significant value in lieu of paying $100 per load, Jones cannot establish a white

---

[12]    Loveless, a white driver, paid Brasher $100 per load to secure continued preference for loads to Texas.  (Doc. 75-7, p. 2).  Spivey, a white driver, offered Brasher a membership in Spivey's hunting club worth $2,000 in lieu of the $100-per-load payment to secure continued preference for loads to Texas.  (Doc. 75-9, p. 21, ll. 2-15).  Jones testified that Lamont Howard ("Howard"), Donald Anderson, Cedrick Jones, Ricky Powell, and Patrick Gary all paid $100 per load to secure continued preference for loads to Texas.  (Doc. 75-6, p.86, ll. 20-21; p. 111, ll. 18-23 – p. 112, ll. 1-2; p. 118, ll. 11-17; p. 119, ll. 21-23; p. 121, ll. 2-16).

[13]    Loveless and Spivey voluntarily made their offers to Brasher.  (Doc. 75-7, p. 2; Doc. 75-9, p.21, ll. 2-15).  Howard, an African-American driver, also voluntarily paid $100 per load to Brasher.  (Doc. 75-14, p. 14, ll. 7-18).

comparator to demonstrate the necessary discriminatory intent to support his § 1981 claim.[14]

### iii. Legitimate, Non-Discriminatory Reason

Even if he could establish his *prima facie* case by pointing to a white comparator, Jones cannot show that Brasher's proffered legitimate reason for requiring $100 per load to Texas is pretext. Defendants argue that "Brasher's motivation for accepting $100 per load to Texas from African American and white owner/operators was to increase his income based on the profitable Texas loads." (Doc. 75, p. 18; doc. 75-7, p. 23, ll. 1-16). They assert that the scheme "was not based on race[] and was available to all owners and operators." (Doc. 75, p. 18, doc. 75-7, p. 70, ll. 19-23 – p. 71, ll. 1-7). Jones argues that the proffered reason is pretext. He points to Loveless and Spivey who voluntarily compensated Brasher to secure continued preference in contrast to African Americans who were asked to pay $100 per load to Texas. (Doc. 79, p. 13). Jackson testified that he believed the scheme was racially motivated because Brasher "charge[d] only black folks and not white folks." (Doc. 75-2, p. 266, ll. 18-9).

The record establishes that both African American and white drivers voluntarily paid to secure continued preference for loads to Texas and that the

---

[14]     It also goes without saying that Jones cannot point to a possible white comparator in relation to Jackson's now foreclosed-upon § 1981 claim to establish Jones' own § 1981 claim. In other words, Jones cannot point to a perceived white comparator for Jackson Transportation, or even Anderson, who is not a party to this action, to establish his own § 1981 claim. Jones must look to a comparator for himself, not to a comparator for another individual.

scheme was never about race.[15]  When asked what the case is all about at the end of the day, Jackson testified that it is about his money.  (Doc. 75-2, p. 144, ll. 21-23 – p. 145, ll. 1-13; <u>see also</u> doc. 75-2, p. 141, ll. 8-9) ("We would never have been here if wasn't for [money]")).  Jones cannot point to evidence that Brasher intended to discriminate against him on the basis of race.  (Doc. 75-6, p. 220, ll. 4-10; p. 251, ll. 11-14).  Furthermore, Anderson, Howard, Powell, and Pruitt, all African-American drivers, do not believe that Brasher was motivated by racial animus.  (Doc. 75-12, p. 53, ll. 1-23 – p.54, l. 1; doc. 75-14, p. 49, 1. 23 – p. 50, ll. 1-15; doc. 75-15, p. 41, ll. 16-23; doc. 75-16, p. 79, ll. 5-8).  Anderson testified that at the meeting with Davis neither he nor the plaintiffs complained to Davis about "anything to do with race."  (Doc. 75-12, pp. 46, ll. 22-23 – p. 47, ll. 1-15).  As Jackson testified, the record shows that the scheme required by Brasher ultimately came down to money, not racial animus.  Therefore, Jones cannot establish either an alleged contract impairment or Brasher's discriminatory intent for the first possible violation of § 1981.

  b. Post-Meeting § 1981 Claim

   i. *Prima Facie* Case

Even assuming that Brasher's action in denying Jones the right to contract with the Chip Mill after he "cut off" Jones constitutes a contract impairment, Jones

---

[15] <u>See</u> *supra* note 13, at 23.

cannot establish discriminatory intent through identification of a comparator. It is clear from the evidence that (1) there is no direct evidence of discrimination, (2) there is no statistical proof of discrimination, and (3) Jones cannot point to a sufficient white comparator. A proper comparator would be a white driver who continued to haul loads to Texas after the meeting and after the conclusion of the Brasher's scheme. Here, Jones argues that he was denied at least one load when he observed Cedrick Jones, who had less seniority, hauling a load to Texas. (Doc. 75-6, p. 156, ll. 6-15). Jones, however, fails to identify a white driver who continued to haul loads to Texas after the meeting; in fact, Jones can identify only Cedrick Jones, an African American driver, who received a load to Texas over (Chris) Jones after he (Chris Jones) was "cut off" after the meeting.

### ii. Legitimate, Non-Discriminatory Reason

Even if he could establish his *prima facie* case by identifying a proper comparator, Jones cannot show that Brasher's proffered legitimate reason for allowing other drivers to continue hauling loads to Texas is pretext. Defendants argue that "[t]he reason Brasher allegedly 'cut off' [Jones] after the meeting with Davis, was that he was upset that they had gone 'behind his back' to complain to Davis, which . . . had nothing to do with [Jones'] race." (Doc. 75, p. 18; see also doc. 75-7, p. 33, ll. 17-20). Jones has failed to argue that this reason is pretextual. The evidence establishes that Anderson testified that neither he nor the plaintiffs

complained to Davis about "anything to do with race" at the meeting. (Doc. 75-12, pp. 46, ll. 22-23 – p. 47, ll. 1-15). As such, Jones cannot establish discriminatory intent for the second possible violation of § 1981. Therefore, summary judgment is due to be GRANTED for any claim of discrimination brought by Jones under § 1981 as to each defendant.

### 3. § 1981 Retaliation Claim

In CBOCS West, Inc. v. Humphries, the Supreme Court held that § 1981 "encompasses claims of retaliation." 553 U.S. 442, 457 (2008); see also Bryant v. Jones, 575 F.3d 1281, 1301 (11th Cir. 2009) (applying the precedent of CBOCS in the Eleventh Circuit). Under a non-employment § 1981 retaliation claim, "a plaintiff must allege a defendant retaliated against him because the plaintiff engaged in statutorily protected activity." Jimenez, 596 F.3d at 1311; cf. Rose v. Wal-Mart Stores East, Inc., 631 Fed. App'x 796, 798 (11th Cir. 2015) (discussing retaliation claims under § 1981 in the employment context and explaining that "§ 1981 prohibit employers from taking adverse actions against employees in retaliation for their opposition to statutorily prohibited racial discrimination").

"To establish a claim of retaliation under . . . section 1981, a plaintiff must prove that [1] he engaged in statutorily protected activity, [2] he suffered a materially adverse action, and [3] there was some causal relation between the two events." Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir.

2008). Once the plaintiff establishes these elements, the defendant "has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged . . . action as an affirmative defense to liability." Id. However, "[t]he plaintiff bears the ultimate burden of proving retaliation . . . and that the reason provided by the [defendant] is a pretext for prohibited retaliatory conduct." Id.

The Eleventh Circuit has held that "protected activities" in the context of both Title VII and § 1981 include "the voicing informally of a complaint to superiors." Bolton v. Baldwin County Public Schools, 672 Fed. App'x 800, 803 (11th Cir. 2015). "As with other statutory retaliation claims, such a claim under § 1981 requires that the protected activity involve the assertion of rights encompassed by the statute."[16] Moore v. Grady Memorial Hospital Corporation, 834 F.3d 1168, 1176 (11th Cir. 2016) (quoting Jimenez, 596 F.3d at 1311) (internal quotation marks omitted).

In other words, "in order to constitute statutorily protected activity capable of supporting a § 1981 retaliation claim, an employee's complaint must reasonably convey that she is opposing discrimination based specifically upon race, versus some other type of discrimination or injustice generally." Willmore-Cochran v.

---

[16] Because Jackson cannot assert the contract rights of Jackson Transportation, LLC, for a claim of discrimination under § 1981 for himself as an individual (as discussed in Section IV.A.1.), Jackson's protected activity (attending the meeting and voicing informal complaint) does not involve an "assertion of rights encompassed by the statute," and therefore, he individually lacks standing to assert a claim of retaliation under § 1981 for himself. Only Jones and Jackson Transportation, LLC (which is not a party to this action), may assert a claim of retaliation under § 1981.

Wal-Mart Assocs., Inc., 919 F. Supp. 2d 1222, 1224 (N.D. Ala. 2013) (citing Pennington v. City of Huntsville, 261 F.3d 1262, 1265 n.1 (11th Cir. 2001) and Graham v. Methodist Home for the Aging, No. 2:11-cv-1415-SLB, 2012 WL 3637587, at *24 (N.D. Ala. Aug. 20, 2012)). "Moreover, the employer's racially discriminatory conduct complained of must actually violate § 1981 or, at a minimum, the plaintiff's complaint must be based on a belief that is both objectively reasonable and subjectively in good faith that the conduct violates § 1981." Id. (citing Jimenez, 596 F.3d at 1311 n.6 and Butler v. Alabama Dep't of Transp., 536 F.3d 1209, 1213 (11th Cir. 2008)).

The Eleventh Circuit "construes the causal link element of a prima facie retaliation claim broadly, so that the plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated." Rose, 631 Fed. App'x at 798. In fact, "[c]lose temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716-17 (11th Cir. 2002) (discussing causal connection in relation to Title VII retaliation claims).

Here, Jones would have to show that he made an informal complaint about racial discrimination that impaired his § 1981 contract rights to establish that he engaged in statutorily protected activity. Brasher, McMillan, and McMillan Trucking argue that Jones, Jackson, and Anderson did not complain "that Brasher

was allegedly discriminating against them or other drivers based on race." (Doc. 75, p. 24) (original emphasis omitted). Jones argues that the defendants retaliated against him after he complained to Davis at the meeting about Brasher requesting $100 per load to Texas and when Brasher subsequently refused to grant Jones future loads. (Doc. 79, p. 15). The record establishes that none of the three, Jones, Jackson, or Anderson, complained about Brasher discriminating against them on the basis of race at the meeting with Davis. (Doc. 75-2, p. 119, ll. 18-23 – p. 126, ll. 1-10; p. 130, ll. 21-23 – p. 131, ll. 1-2; doc. 75-6, p. 131, ll. 17-23 – p. 133, ll. 1-4; doc. 75-12, p. 46, ll. 22-23 – p. 47, ll. 1-15).[17] Even further, Anderson testified that "[n]o, he didn't mention anything about race" regarding two phone conversations between Anderson and Brasher after the meeting and "cut off." (Doc. 75-12, p. 50, ll. 4-5). Therefore, Jones cannot establish he engaged in a protected activity. Because Jones cannot show that he engaged in a protected activity, an analysis of the remaining steps in the § 1981 retaliation framework is unnecessary. Therefore, summary judgment is due to be GRANTED for any claim

---

[17] See Doc. 75-12, p. 46, ll. 22-23 – p. 47, ll. 1-15 ("Q. Mr. Jackson did not make any complaints to Brett Davis during that meeting regarding anything to do with race, correct?
A. I don't recall none.
Q. Okay. You did not make any complaints to Brett Davis regarding race, correct?
A. Correct.
Q. And then Mr. Jones did not make any complaints to Brett Davis with regard to race during that meeting at the Sawmill Restaurant, correct?
A. As far as my knowledge, yes.
Q. Okay. So it would be fair to say that no one complained to Brett Davis that they thought that Mr. Brasher was charging these payments based on race, correct?
A. Correct.")

of retaliation under § 1981 brought by Jones as to Brasher, McMillan, and McMillan Trucking.

The Chip Mill and Davis, however, have not moved for summary judgment on the § 1981 retaliation claim. Although the Chip Mill and Davis generally address Count I in their brief (doc. 69, pp. 14-16), their analysis focuses solely on discrimination under § 1981, not retaliation. The court, therefore, will not construe their motion and brief to move for summary judgment on Jones' § 1981 retaliation claim. As such, the § 1981 retaliation claim remains pending against the Chip Mill and Davis.

## B. Count III – Racketeering Claim[18]

Count Three remains pending against all defendants.[19] The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, "imposes criminal and civil liability upon those who engage in certain 'prohibited

---

[18]     Because the plaintiffs pleaded a civil conspiracy claim in Count II (doc. 45, p. 12-13), the court will first analyze all potential tort claims before reaching the merits of Count II.

[19]     As an initial matter, the court recognizes that Jackson likely lacks standing to bring a claim under RICO. The Eleventh Circuit in Bivens Gardens Office Building, Inc. v. Barnett Banks of Florida, Inc., held that that "a party whose injuries result 'merely from the misfortunes visited upon a third person by the defendant's acts' lacks standing to pursue a claim under RICO." 140 F.3d 898, 906 (11th Cir. 1998). "RICO standing will not arise solely because one is a shareholder or a limited partner in a company that was the target of the alleged RICO violation. . . . Such an injury is too indirect or 'derivative' to confer RICO standing." Id. As explained in Section IV.A.1., Jackson Transportation, LLC, hauled loads for the Chip Mill and was the entity "cut off" after the meeting, not Jackson as an individual. As such, Jackson Transportation, LLC, was the target of Brasher's scheme that the plaintiffs allege violated RICO. Even if Jackson has standing as an individual, Jackson fails, however, to establish a violation of RICO, as will be discussed *infra*.

activities.'  Each prohibited activity is defined in 18 U.S.C. § 1962 to include, as one necessary element, proof . . . of 'a pattern of racketeering activity.'" <u>H.J. Inc. v. Northwestern Bell Telephone Co.</u>, 492 U.S. 229, 232 (1989).  Specifically, under § 1962(c), RICO renders it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  In other words, § 1962(c) "prohibits an individual from 'participating in the conduct of the affairs of an enterprise engaged in interstate commerce, through a pattern of racketeering activity."  <u>See</u> <u>Carden v. Town of Harpersville</u>, No. 2:15-cv-01381-RDP, 2017 WL 4180858, at *6 (quoting <u>Almanza v. United Airlines, Inc.</u>, 851 F.3d 1060, 1066 (11th Cir. 2017)).   Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate [§ 1962(c)]."  "[A] person found in a private civil action to have violated RICO is liable for treble damages, costs, and attorney's fees [under § 1964(c)]."  <u>H.J. Inc.</u>, 492 U.S. at 233.

Congress defined an enterprise to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  18 U.S.C. § 1961(4).  Racketeering activities include "'any act or threat involving' specified state-law crimes, any 'act' indictable under various specified federal statutes, and certain

federal 'offenses,'" as defined in 18 U.S.C. § 1961(1). H.J. Inc., 492 U.S. at 232. Plaintiffs allege extortion and wire fraud, which fall under the definition of racketeering activity and operate as predicate acts. 18 U.S.C. § 1961.

"A 'pattern' of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts." Maiz v. Virani, 253 F.3d 641, 671 (11th Cir. 2001). "Predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Id. (some internal quotation marks omitted) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14 (1985)). Importantly, though, "[t]o establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." H.J. Inc., 492 U.S. at 240. In other words, to establish a pattern of racketeering activity, the "plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1264 (11th Cir. 2004) (citing H.J. Inc., 492 U.S. at 239-43). As the Eleventh Circuit has held, "it is not sufficient to simply establish two isolated predicate acts. RICO targets *ongoing* criminal activity, rather than sporadic, isolated criminal acts. . . ." Id.

Furthermore, the "civil plaintiff must also show (1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1348 (11th Cir. 2016) [hereinafter "Ray II"] (internal quotation marks omitted) (quoting Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1282-83 (11th Cir. 2006), abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 714-15 (11th Cir. 2014)). In other words, the plaintiff must establish that the racketeering activity is the proximate cause of the injury. See Ray II, 836 F.3d at 1349. "The connection between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect." Id. However, "[t]he injurious conduct need not be the sole cause of the plaintiffs' injuries, but there must be 'some direct relation' between the conduct and the injury to sustain a claim." Id.

In summary, to recover treble damages under § 1962(c), "a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." Ray v. Spirit Airlines, Inc., 767 F.3d 1220, 1224 (11th Cir. 2014) [hereinafter "Ray I"]. "That being said, a plaintiff does not have to show that a defendant is comparable to an organized crime syndicate to succeed in a RICO action." Carden, 2017 WL 4180858 at *10 (citing Ray II, 836 F.3d at 1348).

*1. Pattern of Racketeering Activity and Continuity*

To establish a successful RICO violation, the plaintiffs "must prove . . . continuity of [the] racketeering activity, or its threat, *simpliciter*. Id. at 241 (emphasis in original). As the Supreme Court explained in H.J. Inc.:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. . . . It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.
>
> Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. . . . A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. . . . In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime." The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that

it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

Id. at 242-43. Therefore, the Eleventh Circuit has held that H.J. Inc., establishes two forms of continuity: "closed-ended" and "open-ended." Ferrell v. Durbin, 311 F. App'x 253, 256 (11th Cir. 2009) (internal quotation marks omitted) (quoting H.J. Inc., 492 U.S. at 242).

    a. Closed-End Continuity

    To establish closed-ended continuity, the plaintiff must prove "a series of related predicates extending over a substantial period of time." Jackson, 372 F.3d at 1265 (11th Cir. 2004) (quoting H.J. Inc., 492 U.S. at 242). In Jackson, the Eleventh Circuit held that a nine-month period was "wholly insufficient" and "not an adequately substantial period of time" to establish close-ended continuity as a necessary prerequisite for a successful RICO claim. Id. at 1266, 1267. In fact, the Eleventh Circuit has acknowledged that "closed-ended continuity cannot be met with allegations of schemes lasting less than a year." Id. at 1266 (citing, among numerous others, Religious Tech Ctr. v. Wollersheim, 971 F.2d 364, 366-67 (9th Cir. 1992) ("We have found no case in which a court [of appeals] has held the [continuity] requirement to be satisfied by a pattern of activity lasting less than a year")); see also Ferrell, 311 F. App'x at 256 (continuing to follow the holding of Jackson). Additionally, "where the RICO allegations concern only a single scheme

with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." Id. at 1267.

The plaintiffs cannot establish closed-end continuity. The defendants argue that the plaintiffs cannot prove closed-ended continuity existed, asserting the scheme only lasted two months, at most. Additionally, the scheme ended immediately after the meeting when McMillan told Brasher to stop accepting the $100-per-load payments. The plaintiffs fail to argue whether they can establish closed-ended continuity.

The undisputed record establishes that the scheme, which the plaintiffs allege is in violation of RICO, began in July of 2014 when Brasher requested $100 per load from Jackson and Jones, among other drivers. (Doc. 75-2, p. 103, ll. 16-23 – p.104, ll. 1-21; doc. 75-6, p. 72, ll. 7-19. Approximately six drivers (Anderson, Lamont Howard, Rickey Powell, Joe Pruitt, Dewayne Loveless, and Trey Spivey), in addition to Jackson, either paid or voluntarily offered to pay the $100-per-load payment to Brasher during the months of July and August of 2014. (Doc. 75-7 (Brasher), p. 28, ll. 17-22; doc. 75-12 (Anderson), p. 13, ll. 12-23 – p. 14, ll. 1-11; doc. 75-14 (Howard), p. 13, ll. 6-23 – p. 14, ll. 1-18, p. 48, ll. 9-23; doc. 75-15 (Powell), p. 21, ll. 21-23 – p. 24, l. 1; doc. 75-16 (Pruitt), p. 42, ll. 8-23

– p. 43, ll. 1-19; doc. 75-8 (Loveless), p. 2, ¶¶ 6-7; doc. 75-9 (Spivey), p. 21, ll. 2-23 – p. 22, ll. 1-2, p. 32, ll. 2-9).

The plaintiffs met with Davis on August 25, 2014, to discuss Brasher's scheme.  (Doc. 75-6, p. 140, ll. 16-20; doc. 75-11; p. 24, ll. 21-23 – p 25, ll. 1-7; doc. 75-2, p. 114, ll. 15-18, p. 119, ll. 6-23 – p. 120, ll. 1-6).  On either August 25 or 26, 2014, Davis talked to McMillan about the scheme.  (Doc. 75-6, p. 138, ll. 1-8; doc. 75-11, p. 29, l. 23- p. 30, ll. 1-5; doc. 75-13, p. 15, ll. 15-23 – p. 16, ll. 1-21).  McMillan then ordered Brasher to stop accepting $100 per load from drivers.  (Doc. 75-6, p. 138, ll. 1-8; doc. 75-13, p. 16, ll. 22-23 – p. 17, ll. 1-13).  Brasher did not accept any payment after that discussion with McMillan following the meeting.  (Doc. 75-7, p. 32, ll. 11-23 – p. 33, ll. 1-4, p. 47, ll. 19-22).

Based on the record, the defendants' alleged RICO violation lasted two months, at most, which is insufficient to establish closed-ended continuity.  See H.J. Inc., 492 U.S. at 242; Jackson, 372 F.3d at 1266 (less than a year insufficient to establish closed-ended continuity).  Even further, because this scheme was "single scheme with a discrete goal," the predicate acts would have had to continue for a much significant period of time than even one to two years.  Jackson, 372 F.3d at 1267.  This comports with the Supreme Court's holding in H.J. Inc., which warned that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."  492 U.S.

at 242. The plaintiffs have failed to prove that closed-ended continuity has been established as to each defendant.

b. Open-Ended Continuity

To establish open-ended continuity, the plaintiffs must show "either that the alleged acts were part of the defendants' 'regular way of doing business,' or that the illegal acts threatened repetition in the future." Jackson, 372 F.3d at 1267 (quoting H.J. Inc., 492 U.S. at 242-43). As the D.C. Circuit Court of Appeals has held, the "illustrations of open-ended continuity [in H.J. Inc.] 'indicate a requirement of far more than a hypothetical possibility of further predicate acts.'" Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1264 (D.C. Cir. 1995) (quoting Pyramid Securities Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1119 (D.C. Cir. 1991)).

The plaintiffs cannot establish open-ended continuity. The defendants argue that Brasher's scheme was isolated and did not establish a "regular way of doing business" for any of the defendants. Additionally, the defendants assert that there is no threat of repetition in the future because McMillan ordered Brasher to stop accepting payments from drivers. The court construes the plaintiffs' brief to argue that they established open-ended continuity because "the pattern of extortion clearly would have continued indefinitely but for the plaintiffs confronting

defendant Davis." (Doc.79, p. 19). However, the plaintiffs fail to explain why this statement is true nor do they offer evidence in support.

The evidence establishes that none of the defendants' "regular course[s] of business" involved Brasher accepting $100 per load from drivers. Specifically, the scheme only applied to loads going to Texas. (Doc. 45, ¶¶ 11, 13; doc. 75-6, p. 77, ll. 16-22, p. 78, ll. 4-7). Furthermore, the manner in which Brasher demanded and accepted payments was neither regular nor consistent; some drivers paid when demanded while other drivers voluntarily offered to pay without a request by Brasher. (Doc. 75-7 (Brasher), p. 28, ll. 17-22; doc. 75-12 (Anderson), p. 13, ll. 12-23 – p. 14, ll. 1-11; doc. 75-14 (Howard), p. 13, ll. 6-23 – p. 14, ll. 1-18, p. 48, ll. 9-23; doc. 75-15 (Powell), p. 21, ll. 21-23 – p. 24, l. 1; doc. 75-16 (Pruitt), p. 42, ll. 8-23 – p. 43, ll. 1-19; doc. 75-8 (Loveless), p. 2, ¶¶ 6-7; doc. 75-9 (Spivey), p. 21, ll. 2-23 – p. 22, ll. 1-2, p. 32, ll. 2-9). Furthermore, the scheme lasted only two months and the receipt of payments by Brasher from drivers was sporadic at best, not long or consistent enough to establish a regular course of business for either Brasher, the Chip Mill, or Davis. (Id.). McMillan, and by extension, McMillan Trucking, was not aware of their drivers accepting money for loads. (Doc. 75-13, p. 21, l. 23 – p. 22, ll. 1-4).

Although the evidence establishes that Brasher accepted "tips" in the past, his receipt of these tips was sporadic at best and does not establish a regular course

of business when considered in addition to the scheme. Specifically, Brasher would receive tips when he saved a load to haul over the weekend for a driver who had issues during the week which prevented that driver from hauling. (Doc. 75-7, p. 24, ll. 11-23). The undisputed record establishes that he would receive, at most, a few tips a year. (Doc. 75-7, p. 45, ll. 19-23 – p. 46, ll. 1-4). Furthermore, the tip was for an amount significantly less than $100 per load and was not dependent on the load's location, which is in contrast to the scheme of $100 per load to Texas. (Doc. 75-7, p. 24, ll. 11-23). The tip was a true gratuity in the sense that the driver offering the tip did so voluntarily. Logically, the acceptance of sporadic gratuities cannot be in the regular course of business.

In contrast, the $100-per-load payment to Texas was most likely involuntary. It is conceivable that the drivers who "voluntarily" paid Brasher $100 per load did not in fact do so voluntarily. For example, if the driver heard through the grapevine that other drivers were paying for loads to Texas, did the drivers actually pay Brasher voluntarily? The answer easily could be that the payments were in fact involuntary. In other words, the drivers were motivated to pay Brasher $100 per load in order to ensure continued preference on loads to Texas after hearing that other drivers were doing just that. Therefore, this evidence of involuntary payment for loads to Texas cannot be combined with the true gratuities

that Brasher received in the past in order to establish Brasher's regular course of business.

Furthermore, the illegal acts simply do not threaten repetition in the future. See Jackson, 372 F.3d at 1268 ("in spite of the plaintiffs' bald suggestion that the defendants might have continued their fraud in the future had they not been uncovered, this is not sufficient to allege open-ended continuity").  The record is undisputed: McMillan put a stop to Brasher's demanding and accepting from drivers $100 per load to Texas.  (Doc. 75-6, p. 138, ll. 1-8; doc. 75-13, p. 16, ll. 22-23 – p. 17, ll. 1-13).  Brasher did not accept any payment after his discussion with McMillan following the meeting.  (Doc. 75-7, p. 32, ll. 11-23 – p. 33, ll. 1-4, p. 47, ll. 19-22).  McMillan undisputedly prevented Brasher's "illegal acts" from continuing in the future.

As such, the plaintiffs cannot prove continuity to establish a practice of racketeering activities to satisfy a claim under civil RICO, § 1962(c).  Therefore, summary judgment is due to be GRANTED for the claim brought by the plaintiffs under § 1962(c) as to each defendant.

## 2. *Enterprise*

Even if the plaintiffs could establish open-ended continuity as to Brasher (*i.e.*, that accepting payments from drivers was in the regular course of his business), the plaintiffs cannot establish that the requisite enterprise existed to

successfully maintain a claim under civil RICO. Although the court recognizes that neither Brasher nor Davis raises this argument in their briefs, the plaintiffs address the enterprise argument in their brief. McMillan and McMillan Trucking argue that they are not engaged in an enterprise, asserting that they are not racketeers simply because Brasher abused his relationship with them. The plaintiffs argue that an association-in-fact enterprise existed between Brasher and Davis. As such, the court will address the argument for the sake of completeness.

To successfully maintain a civil RICO claim, the plaintiffs must establish the existence of an enterprise, the second element in the test. See Ray I, 767 F.3d at 1224. There is no dispute that Brasher "operated or managed" the purported enterprise. Id. However, it is disputed whether an enterprise existed. Congress defined an enterprise to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

a. Association-in-Fact Enterprise

An association-in-fact enterprise is formed when "a group of persons associated together for a common purpose of engaging in a course of conduct." Almanza, 851 F.3d at 1067 (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). To establish an association-in-fact enterprise, the plaintiffs must show "three 'structural features': (1) a 'purpose,' (2) 'relationships among those

associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" <u>Almanza</u>, 851 F.3d at 1067 (quoting <u>Boyle v. United States</u>, 556 U.S. 938, 944, 946 (2009)).

In the Eleventh Circuit, "the existence of an enterprise 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" <u>United States v. Goldin Industries, Inc.</u>, 219 F.3d 1268, 1275 (11th Cir. 2000). In other words, "the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate [acts], that is, the pattern of racketeering activity requisite to the RICO violation." <u>Id.</u>

An association-in-fact enterprise is "simply a continuing unit that functions with a common purpose." <u>Ray II</u>, 836 F.3d at 1352 (quoting <u>Boyle</u>, 556 U.S. at 948). Therefore, there must be "evidence that the various associates function as a continuing unit." <u>Ray II</u>, 836 F.3d at 1352 (quoting <u>Turkette</u>, 452 U.S. at 583). Under § 1962(c), "an 'enterprise' must have some longevity, since the offense proscribed by that provision demands proof that the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'" <u>Boyle</u>, 556 U.S. at 946. In <u>Brand Energy & Infrastructure Services, Inc. v. Irex Contracting Grp.</u>, No. 16-2499, 2017 WL

1105648, at *11 (E.D. Pa. March 24, 2017), the district court found a two year period to satisfy the longevity requirement.[20]

Here, the enterprise's, at most, two-month existence does not satisfy the longevity requirement, assuming a fact dispute exists as to the first two elements. The record does not establish that the enterprise "had 'affairs' of sufficient duration" or that "various associates function[ed] as a continuing unit." Ray II, 836 F.3d at 1352. While the record does create a fact question as to whether Davis gave Brasher the idea to charge $100 per load to Texas or even approved it, the plaintiffs fail to show how this purportedly isolated incident establishes a "continuing unit" or "'affairs' of sufficient duration." (Id.; see also doc. 75-7, p. 23, ll. 8-22; doc. 75-12, p. 72, ll. 15-23 – p. 73, ll. 1-5).

The record does not establish continuing involvement by Davis after allegedly suggesting approving Brasher's $100-per-load scheme. Even though Davis had daily discussions with Brasher to discuss loads and to make sure everything ran smoothly (doc. 75-7, p. 13, ll. 19-23 – p. 15, l. 1), there is simply no evidence in the record that Davis helped Brasher carry out the scheme, supervised

---

[20]     The district court in Brand Energy & Infrastructure Services, 2017 WL 1105648, at *11, also cited to other cases establishing a sufficient period of time to satisfy the longevity requirement: "Devon Drive Lionville, LP v. Parke Bancorp, Inc., No. 2:15–cv–3435, 2016 WL 7475816, at *8 (E.D. Pa. Dec. 29, 2016) (recognizing that a span of "approximately two years" and "two years" is sufficient to satisfy Boyle's longevity requirement); . . . United States v. Eiland, 738 F.3d 338, 360 (D.C. Cir. 2013) (two years sufficient); CIT Grp./Equip. Fin., Inc. v. Krones, Inc., No. 9–432, 2009 WL 3579037, at *9 (W.D. Pa. Sept. 16, 2009) (holding that 18-month period of alleged unlawful conduct was sufficient to satisfy RICO's longevity requirement)."

the scheme, or even discussed the scheme with Brasher again. Furthermore, the record establishes that Davis put a stop to the scheme by talking to McMillan about Brasher's actions, suggesting that the common purpose prong may not be satisfied. (Doc. 75-6, p. 138, ll. 1-8; doc. 75-11, p. 29, l. 23 – p. 30, ll. 1-5; doc. 75-13, p. 15, ll. 15-23 – p. 16, ll. 1-21; see also doc. 75-6, p. 138, ll. 1-8; doc. 75-13, p. 16, ll. 22-23 – p. 17, ll. 1-13). Even if this isolated incident of approving the scheme could establish a "continuing unit," the purported enterprise lasted two months, at most, an insufficient duration to satisfy the longevity requirement necessary to establish an enterprise.[21]

### b. Single Individual Enterprise

Alternatively, under § 1961(4), "a single individual may be considered an enterprise under the statutory definition." United States v. Hawkins, 516 F. Supp. 1204, 1206 (M.D. Ga. 1981) (citing United States v. Elliott, 571 F.2d 880, 898 n. 18 (5th Cir. 1978) ("The number of persons making up an enterprise is irrelevant, however, in that even a single individual may be considered an 'enterprise' under the statutory definition.")).[22] However, an enterprise "is an entity separate and apart from the pattern of activity in which it engages." Turkette, 452 U.S. at 583.

---

[21]     The defendants raised other arguments to show why summary judgment is due to be granted. Because the plaintiffs fail to establish the existence of an enterprise or continuity, discussion of those arguments and RICO elements is pretermitted.

[22]     The Eleventh Circuit Court of Appeals has adopted as binding precedent the decisions of the former Fifth Circuit decided prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

In other words, a RICO defendant must be distinct from the RICO enterprise. <u>Ray II</u>, 836 F.3d at 1355. "The distinction between the RICO person and the RICO enterprise is necessary because the enterprise itself can be a passive instrument or victim of the racketeering activity." <u>Goldin Industries, Inc.</u>, 219 F.3d at 1275.

Therefore, "to state a civil RICO claim, a plaintiff must establish a distinction between the defendant 'person' and the 'enterprise' itself." <u>Ray II</u>, 836 F.3d at 1355 (citing <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 161-62 (2001)). This premise flows from the statutory text of § 1962(c), which makes "it 'unlawful for any person *employed by or associated with* any enterprise' to engage in racketeering activities through that enterprise." <u>Ray II</u>, 836 F.3d at 1355 (quoting § 1962(c)) (emphasis added). "It does not make sense for a person to employ or associate with himself. Thus, an enterprise may not simply be a 'person' referred to by a different name." <u>Ray II</u>, 836 F.3d at 1355 (quoting <u>Cedric Kushner Promotions</u>, 533 U.S. at 161) (internal quotation marks omitted); <u>see also</u> <u>Guidry v. Bank of LaPlace</u>, 954 F.2d 278, 283 (5th Cir. 1992) ("If [the proprietorship] had no employees or other associates and simply did business under the name of [the proprietorship], it could hardly be said that [the proprietor] was associating with an enterprise ...; you cannot associate with yourself, any more than you can conspire with yourself.") (internal citations omitted).

As such, there must be an enterprise interest separate and distinct from the interest of the RICO person; other members of the RICO enterprise must be free to act independently of each other.  Doe v. Epstein, No. 08-80893-CIV-MARRA, 2010 WL 11504810, at *4-5 (S.D. Fla. March 3, 2010) (interpreting Florida RICO statutes in accordance with federal RICO jurisprudence).  "The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise."  Goldin Industries, Inc., 219 F.3d at 1275.

Here, Brasher, as a single individual, cannot be both the RICO enterprise and the RICO defendant to establish the existence of the requisite enterprise, and the plaintiffs cannot point to any conduct by Brasher distinct from the purported enterprise (*i.e.*, Brasher's participation in the alleged predicate acts cannot be used to establish both an enterprise and pattern of racketeering activity to find liability as a RICO defendant).  Therefore, Brasher as a defendant and enterprise "are one and the same[,]" and he "fails the distinction test" in order to prove the existence of an enterprise.  See Guidry, 954 F.2d at 283.  Because the plaintiffs cannot point to an enterprise, either an association-in-fact enterprise or a single individual enterprise, summary judgment on the civil RICO claims is due to be GRANTED for this reason as well as to the claims brought against the defendants.

### 3. RICO Conspiracy Claim

Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of [any] subsection . . . of this section."  The plaintiffs must prove "a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts."  American Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1293 (11th Cir. 2010) (quoting Republic of Panama v. BCCI Hodlings (Luxembourg) S.A., 119 F.3d 935, 950 (11th Cir. 1997)).  The RICO agreement can be proven by either direct evidence or it can be "inferred from the conduct of the participants."  Id.  (quoting Republic of Panama, 119 F.3d at 950) (internal quotation marks omitted).

However, in Jackson, the Eleventh Circuit Court of Appeals observed a defendant "may be liable for RICO conspiracy even if it is not liable for the substantive RICO offense."  Jackson, 372 F.3d at 1269 (noting that the plaintiffs' "observation" of the law "is undoubtedly correct").  Yet the Court went on to state that "[the plaintiffs must] allege an illegal agreement to violate a substantive provision of the RICO statute" to support a RICO conspiracy claim.  Id.  In Jackson, the Court ultimately affirmed the dismissal of a RICO conspiracy claim, finding "that the complaint failed to state a substantive RICO claim, and the RICO conspiracy add[ed] nothing.  [The complaint] simply conclude[d] that the

defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation." Id. In Rogers v. Nacchio, 241 Fed. App'x 602, 609 (11th Cir. 2007), the Eleventh Circuit Court of Appeals summarized the rule in Jackson as follows: "where a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails." In American Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1296 n. 6 (11th Cir. 2010), the Court observed that the majority rule established by sister circuits holds that "if a plaintiff fails to state a claim of a primary RICO violation, then the plaintiff's civil RICO conspiracy claim necessarily fails."[23]

The plaintiffs cannot establish the existence of a RICO conspiracy. The defendants argue that the plaintiffs failed to put forth sufficient evidence of an illegal agreement or a violation of § 1962(c), and therefore, there is not a viable claim of RICO conspiracy under § 1962(d). Brasher further argues that "it is well-established that a RICO conspiracy claim fails when the substantive claim based on § 1962(c) is deficient." (Doc. 75, p. 44). The plaintiffs did not respond to the defendants' arguments regarding the RICO conspiracy claim.

---

[23]     "See GE Invest. Private Placement Partners II v. Parker, 247 F.3d 543, 551 n. 2 (4th Cir. 2001); Efron v. Embassy Suites, P.R., Inc., 223 F.3d 12, 21 (1st Cir. 2000); Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3rd Cir. 1993); Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 n. 8 (9th Cir. 1992); Danielsen v. Burnside–Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1232 (D.C.Cir. 1991); Craighead v. E.F. Hutton & Co., 899 F.2d 485, 495 (6th Cir. 1990); In re Edwards, 872 F.2d 347, 352 (10th Cir. 1989)." American Dental Ass'n, 605 F.3d at 1296 n. 6.

Here, the RICO conspiracy claim is intertwined with the substantive RICO claim in Count III of the complaint; there is not a RICO conspiracy claim that contains additional allegations separate from the substantive RICO claim. (Doc. 45, pp. 13-15). As such, this fact brings the above-styled action in line with the holdings of <u>Jackson</u>, 372 F.3d at 1269, and <u>Rogers</u>, 241 Fed. App'x at 609, which state that a RICO conspiracy claim fails if the substantive RICO claim fails. Therefore, the plaintiffs cannot establish a RICO conspiracy claim, and summary judgment is due to be GRANTED for the claim brought by the plaintiffs under § 1962(d) as to each defendant.

### C. Count IV – Violation of Civil Rights under 42 U.S.C. § 1982

Count IV remains pending only against the Chip Mill and Davis; at a previous stage of litigation, the court dismissed this count as to the other defendants because the plaintiffs failed to state a claim upon which relief can be granted. (<u>See generally</u> doc. 56, pp. 12-13). As to Count IV, the plaintiffs allege in their complaint that the defendants violated their civil rights by discriminating against the plaintiffs in violation of 42 U.S.C. § 1982. The Chip Mill and Davis argue more or less that the plaintiffs cannot state a legal claim, and therefore, they are entitled to summary judgment.

Under 42 U.S.C. § 1982, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to

inherit, purchase, lease, sell, hold, and convey real and personal property." The plaintiffs were not deprived of any incidents of real or personal property—they were deprived of the equal opportunity to contract. They cannot claim as cognizable real or personal property some 'right' to be assigned loads to haul. Therefore, the plaintiffs cannot assert a legal claim under § 1982 because there has not been an interference with property rights; a "right" to be assigned loads is not a property right. As such, summary judgment is due to be GRANTED for the claim brought by the plaintiffs under § 1982 as to the Chip Mill and Davis.

### D. Count V – Conspiracy to Deprive Plaintiffs of Civil Rights under 42 U.S.C. § 1985

Count V remains pending only against the Chip Mill and Davis; at a previous stage of litigation, the court dismissed this count as to the other defendants because the plaintiffs failed to state a claim upon which relief can be granted. (See generally doc. 56, pp. 13-15). As to Count V, the plaintiffs allege in their complaint that the Chip Mill and Davis conspired to violate the plaintiffs' civil rights in violation of 42 U.S.C. § 1985.[24] The Chip Mill and Davis argue more or less that the plaintiffs cannot state a legal claim, and therefore, they are entitled to summary judgment. Under 42 U.S.C. § 1985(3), it is unlawful for "two

---

[24]     The other two subsections of § 1985 do not apply to these facts. Section 1985(1) provides a remedy against conspiracies intended to interfere with the acts and functions of public officers, while § 1985(2) provides a remedy against conspiracies to interfere with witnesses, jurors, or parties in federal court proceedings or otherwise to obstruct justice. The second amended complaint does not allege facts implicating either of these provisions.

or more persons in any State or Territory [to] conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law."  In <u>Jimenez</u>, the Eleventh Circuit held that

> [t]o state a claim under § 1985(3), a plaintiff must allege: (1) defendants engaged in a conspiracy; (2) the conspiracy's purpose was to directly or indirectly deprive a protected person or class the equal protection of the laws, or equal privileges and immunities under the laws; (3) a conspirator committed an act to further the conspiracy; and (4) as a result, the plaintiff suffered injury to either his person or his property, or was deprived of a right or privilege of a citizen of the United States.

596 F.3d at 1312.  "When the alleged § 1985(3) conspirators are private actors, the plaintiff must demonstrate that the conspiracy was aimed at rights constitutionally protected against private impairment."  <u>Id.</u>

The Supreme Court has held only that "the right to interstate travel and the right against involuntary servitude" are "enforceable against private conspirators under § 1985(3)."  <u>Id.</u>  "Other courts have held conspiracies to violate contract and property rights—violations that form the basis of § 1981 claims—cannot spawn § 1985(3) claims."  <u>Id.</u> at 1312 n. 7 (citing <u>Brown v. Philip Morris Inc.</u>, 250 F.3d 789, 805–06 (3d Cir. 2001)).  Therefore, conspiracies to violate § 1981 do not

create a sufficient basis to assert a claim under § 1985(3).  Id. at 1312.  As the court previously held as to the other defendants, the plaintiffs cannot assert a legal claim against the Chip Mill or Davis under § 1985(3) for a purported conspiracy to violate § 1981.  Summary judgment is due to be GRANTED on the plaintiffs' claim under § 1985(3)brought against the Chip Mill and Davis.

### E. Count VI – Unjust Enrichment

Count VI remains pending against Brasher, the Chip Mill, and Davis.[25] Alabama case law recognizes that "unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another."  Battles v. Atchison, 545 So. 2d 814, 815 (Ala. Civ. App. 1989).  "The essence . . . of unjust enrichment . . . is that a plaintiff can prove facts showing that defendant *holds* money which, in equity and good conscience, belongs to plaintiff or *holds* money which was improperly paid to defendant because of mistake or fraud."  Dickinson v. Cosmos Broadcasting Co., Inc., 782 So. 2d 260, 266 (Ala. 2000) (emphasis in original) (quoting Hancock-Hazlett Gen. Constr. Co. v. Trane Co., 499 So. 2d 1385, 1387 (Ala. 1986)).

The Alabama Supreme Court holds that "[t]o prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that (1) the defendant

---

[25] Specifically, only a claim of unjust enrichment by Jackson remains pending against Brasher, the Chip Mill, and Davis.  A claim of unjust enrichment by both plaintiffs remains pending only against the Chip Mill and Davis.

knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." Portofino Seaport Vill., LLC v. Welch, 4 So. 3d 1095, 1098 (Ala. 2008). The Alabama Civil Court of Appeals noted a second test to establish unjust enrichment:

> [o]ne is unjustly enriched if his retention of a benefit would be unjust. Retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor, or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched.

Jordan v. Mitchell, 705 So. 2d 453, 458 (Ala. Civ. App. 1997) (internal citations omitted). Both forms of unjust enrichment are valid in Alabama, as recognized in Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C., 77 So. 3d 139, 145-146 (Ala. 2011).

### 1. Brasher

Brasher does not dispute that "Jackson paid Brasher for loads to Texas on three occasions." (Doc. 75, p. 45). He argues, however, that Jackson does not allege that he failed to receive the anticipated benefit of paying Brasher. Further, he asserts that Jackson did not pay Brasher because of any mistake or fraud and that Brasher's conduct was not unconscionable or wrongful. Jackson argues that

Brasher's actions "were unlawful, and equity and good conscience demand the return of the funds." (Doc. 79, p. 20).

Jackson, however, fails to allege or come forth with evidence in the record establishing (1) that he did not receive the benefit of his bargain, (2) that he was mistaken as to Brasher's statements regarding the scheme (see docs. 42 and 56 dismissing any claim of fraud as to Brasher), or (3) that Brasher's conduct was wrongful or unconscionable. See Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co., 483 F.3d 1265, 1273 (11th Cir. 2007) (quoting Fed. R. Civ. P. 56(e)) ("[A]n adverse party may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."). As such, summary judgment is due to be GRANTED on Jackson's claim of unjust enrichment as to Brasher.

### 2. *The Chip Mill and Davis*

Because Jones asserts in the Amended Complaint that he never paid Brasher the $100 per load payment and the record establishes this fact, he cannot satisfy the legal elements of an unjust enrichment case; in other words, he cannot assert that the Chip Mill or Davis were "enriched" at his expense. Jackson states that he made payments of $100 per load to Brasher, but he does not allege any facts supporting the claim that the Chip Mill or Davis received any benefit from the $100-per-load scheme. Although the plaintiffs have set out how Brasher's

employment arrangement benefited all defendants in their Second Amended Complaint (doc. 45), the benefit of the employment arrangement does not create enrichment by the Chip Mill or Davis from the scheme. The employment benefit existed separate and apart from the scheme. Importantly, there is no allegation or evidence that anyone other than Brasher received any amount from the $100-per-load payments that Brasher charged Jackson. Therefore, summary judgment is due to be GRANTED as to the plaintiffs' claim of unjust enrichment against the Chip Mill and Davis.

### F. Count VII – Fraud and Deceit

Count VII remains pending only against the Chip Mill and Davis; at a previous stage of litigation, the court dismissed this count as to the other defendants because the plaintiffs failed to state a claim upon which relief can be granted. (See generally doc. 56, p. 16). As to Count VII, the plaintiffs allege in their complaint that the defendants committed acts of fraud and deceit by making various false statements that the plaintiffs then relied upon in connection to the $100-per-load scheme. Specifically, the plaintiffs allege that "Davis intended to deceive the [p]laintiffs by saying that he would investigate the matter and get back with them." (Doc. 45, p. 20). The Chip Mill and Davis argue that the plaintiffs fail to assert any misleading or false statements made by the Chip Mill or Davis.

Under the Alabama Code, "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted upon by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."  Ala. Code § 6-5-101 (1975).  Alabama Code § 6-5-100 states that fraud "accompanied with damage to the party defrauded" provides a civil right of action.  The Alabama Code defines fraudulent deceit as:

(a)     One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.

(b)     A deceit within the meaning of this section is either:

(1)     The suggestion as a fact of that which is not true by one who does not believe it to be true;

(2)     The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

(3)     The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4)     A promise made without any intention of performing it.

Ala. Code § 6-5-104.  A right of action arises under this code section if there is "[w]illful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury."  Ala. Code § 6-5-103.  "Mere concealment

of such a fact, unless done in such a manner as to deceive and mislead, will not support an action," and "knowledge of a falsehood constitutes an essential element." Id.

There is no allegation that the Chip Mill or Davis lied about or misled the plaintiffs about the requirement or purpose of the payments in any way that induced them to pay $100 per load. Additionally, there is no allegation that the Chip Mill or Davis made any representation at all to the plaintiffs, except for Davis's statement which will be discussed *infra*. Finally, there is no evidence that the plaintiffs relied to their detriment upon any statement nor have they shown any damage they suffered. See Dadeland Depot, Inc, 483 F.3d at 1273 ("[A]n adverse party may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.").

The plaintiffs do allege that "Davis intended to deceive the [p]laintiffs by saying that he would investigate the matter and get back with them." (Doc. 45, p. 20). However, there was no deceit. A deceit occurs only if there are facts showing that Davis never had any intention of investigating the matter and getting back with them. This is belied by the evidence that Davis reported Brasher's scheme of requesting $100 per load from drivers to McMillan, indicating at the very least that Davis conducted some form of investigation. (Doc. 75-6, p. 138, ll. 1-8; doc. 75-11, p. 29, l. 23 – p. 30, ll. 1-5; doc. 75-13, p. 15, ll. 15-23 – p. 16,

ll. 1-21; <u>see also</u> doc. 75-6, p. 138, ll. 1-8; doc. 75-13, p. 16, ll. 22-23 – p. 17, ll. 1-13).  The plaintiffs fail to cite any evidence in the record that Davis never intended to follow through on these promises at the moment he made them.  <u>See</u> <u>Dadeland Depot, Inc.</u>, 483 F.3d at 1273.  For all that appears in the Second Amended Complaint (doc. 45) and the evidentiary record, Davis's intent was to investigate the plaintiffs' claims and report back to them.  Thus, his statement was not a deceit, made by Davis knowing it to be false.

Furthermore, this statement does not qualify as fraud.  Except for intentional deceits, Alabama law does not recognize fraud with respect to a statement concerning a future event. As the Alabama Supreme Court has stated:

> This Court has stated that "[a] mere statement of opinion or prediction as to events to occur in the future is not a statement of a 'material fact' upon which individuals have the right to rely and, therefore, it will not support a fraud claim." <u>Crowne Invs., Inc. v. Bryant</u>, 638 So.2d 873, 877 (Ala.1994). "Where the representation of an opinion is involved, a person must prove not only that there was an intent to deceive, but also that his reliance was reasonable." <u>Reynolds v. Mitchell</u>, 529 So.2d 227, 231 (Ala.1988) (citing <u>Bedwell Lumber, Inc. v. T & T Corp.</u>, 386 So.2d 413 (Ala.1980)).

<u>McCutchen Co. v. Media Gen., Inc.</u>, 988 So. 2d 998, 1002 (Ala. 2008). Similarly, the court has stated:

> To establish a cause of action for fraud, a plaintiff must prove that the defendant knowingly made a false representation of a material, existing fact on which the plaintiff relied to his detriment. <u>Parker v.</u>

Thyssen Mining Construction, Inc., 428 So.2d 615 (Ala.1983). Woodard v. Woodard, 413 So.2d 1060 (Ala.1982). In cases of misrepresentation of existing facts, a reckless misrepresentation might constitute fraud. The rule is different where the alleged representation relates to some future event, such as the promises which Westinghouse allegedly made. In such a situation, the law requires, in addition to the normal elements of falsity, reliance and damage, proof that, at the time the statement or promise about the future was made, there was an actual fraudulent intent not to perform the act promised and an intent to deceive the plaintiff. Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 68 So.2d 314 (1953); accord, Robinson v. Allstate Insurance Company, 399 So.2d 288 (Ala.1981).

Kennedy Elec. Co. v. Moore-Handley, Inc., 437 So. 2d 76, 80 (Ala. 1983).

The plaintiffs have not alleged or cited to any facts in the record showing a "fraudulent intent not to perform the act promised" when Davis stated that he would investigate their claims and get back with them. See Kennedy, 437 So. 2d at 80. The record demonstrates that Davis discussed Brasher's scheme with McMillan, who then put a stop to it. (Doc. 75-6, p. 138, ll. 1-8; doc. 75-11, p. 29, l. 23 – p. 30, ll. 1-5; doc. 75-13, p. 15, ll. 15-23 – p. 16, ll. 1-21; see also doc. 75-6, p. 138, ll. 1-8; doc. 75-13, p. 16, ll. 22-23 – p. 17, ll. 1-13). This, at the very least, constitutes evidence of a possible investigation.

However, the plaintiffs do not cite to any specific evidence in the record which creates a genuine issue of material fact as to whether this was actually an investigation or whether Davis did not intend to investigate their claim at the moment he made the statement. See Dadeland Depot, Inc., 483 F.3d at 1273.

Furthermore, the plaintiffs fail to demonstrate how they relied on either part of Davis's statement to their detriment and what damages, if any, they suffered. As such, summary judgment is due to be GRANTED on Count VII as to the Chip Mill and Davis because the plaintiffs have failed to "set forth specific facts [from the record creating] a genuine issue of material fact" as to any claim of fraud or deceit allegedly committed by the Chip Mill and Davis. Id.

### G. Count II – Conspiracy

Count II remains pending against all defendants. To prove the existence of a civil conspiracy, the plaintiffs must prove "a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." Keith v. Witt Auto Sales, Inc., 578 So. 2d 1269, 1274 (Ala. 1991); see also Singleton v. Protective Life Ins. Co., 857 So. 2d 803, 814 (Ala. 2003). The Alabama Court of Civil Appeals states that

> [t]he essence of a conspiracy is an agreement, a meeting of the minds between the conspirators. One cannot inadvertently become a member of a civil conspiracy. The plaintiff must allege and prove that the claimed conspirators had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy.

First Bank of Childersburg v. Florey, 676 So. 2d 324, 327 (Ala. Civ. App. 1996) (internal citations omitted). Fundamentally, though, "[t]he gist of the action is not the conspiracy alleged but the wrong committed." Singleton, 857 So. 2d at 814. If

the underlying torts "fail as a matter of law, the conspiracy claim must also fail because there is no 'actionable wrong' to support a conspiracy theory." Id.

### 1. Brasher, McMillan, and McMillan Trucking

The defendants argue that the conspiracy claim fails because the plaintiffs cannot satisfy an underlying tort. The plaintiffs argue that the defendants "had an implicit agreement to extort the plaintiffs on the basis of race" in violation of 42 U.S.C. § 1981. (Doc. 79, p. 20). However, as discussed previously herein, the plaintiffs do not have any claims that remain pending against Brasher, McMillan, and McMillan Trucking. The plaintiffs simply cannot point to substantial evidence that Brasher's demands for payment in return for assignment of a load were racially motivated. The evidence shows that African American and white drivers alike paid or gave things of value to Brasher for loads, and that plaintiff Jones continued receiving loads after refusing to pay, at least until the "cut off." Because "there is no 'actionable wrong' to support a conspiracy theory, summary judgment is due to GRANTED as to Brasher, McMillan, and McMillan Trucking on any conspiracy claim. Singleton, 857 So. 2d at 814.

### 2. The Chip Mill and Davis

The defendants argue that there is not an actionable claim under 42 U.S.C. § 1981, which means that the underlying conspiracy claim fails as a matter of law. The plaintiffs argue that Davis and Brasher had an implicit agreement to violate

§ 1981. The Chip Mill and Davis cannot enter into an agreement between themselves to commit an actionable wrong because of the intracorporate conspiracy doctrine, which

> holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves. The doctrine is based on the nature of a conspiracy and the legal conception of a corporation. It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan. . . . [U]nder basic agency principles, the acts of a corporation's agents are considered to be those of a single legal actor. Therefore, just as it is not legally possible for an individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself.

McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000). Therefore, the intracorporate conspiracy doctrine prevents recognition of any alleged conspiracy between the Chip Mill and Davis.

Furthermore, there was not an agreement between "a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." Keith, 578 So. 2d at 1274. As discussed previously herein, all claims brought against Brasher, McMillan, and McMillan Trucking have failed. Although reasonable inferences suggest that Brasher and Davis entered into an agreement (see doc. 75-7, p. 23, ll. 8-22; doc. 75-12, p. 72, ll. 15-23 – p. 73, ll. 1-

5), the agreement was not to commit an actionable wrong. The record establishes that plaintiffs cannot prove that Brasher committed a wrong under Counts I, III, or VI. Therefore, the scheme, as discussed *infra*, does not constitute any tort. Thus, Davis (and the Chip Mill through principles of agency) could not come to a meeting of minds with Brasher to commit a wrong because the scheme was not unlawful nor accomplished through unlawful means. See <u>Keith</u>, 578 So. 2d at 1274. As such, summary judgment is due to be GRANTED as to the Chip Mill and Davis on any conspiracy claim.

## V.  *Conclusion*

This is a case of an unfortunate scheme implemented on the part of one actor, perhaps at the suggestion of another. Despite this questionable scheme, nothing in the record supports the claims brought by the plaintiffs. Despite the plaintiffs' assertion of a racial animus because, they say,[26] Brasher demanded payments only from African American drivers, the undisputed evidence is otherwise. The motions for summary judgments (docs. 69, 74, and 76) are due to be GRANTED. Specifically, the motion for summary judgment filed by the Chip

---

[26]  It is clear that plaintiffs Jones and Jackson have no personal knowledge whether Brasher asked for payments *only* from African American drivers. They were not present during all the many times Brasher interacted with other drivers and, therefore, they cannot know what went on between Brasher and other drivers. The circumstantial evidence presented here undercuts their assertion. The undisputed evidence is that white drivers also paid money and gave things of value to Brasher, whether or not he demanded them, and, further, that plaintiff Jones himself continued to receive loads even after he refused to pay. However unfair, illegal, or unethical Brasher's conduct may have been, it was not racially discriminatory.

Mill and Davis (doc. 69) is due to be GRANTED as to every claim alleged by the plaintiffs, except the claim of § 1981 retaliation, on which the Chip Mill and Davis did not move for summary judgment. The motions for summary judgment brought by Brasher, McMillan, and McMillan Trucking (docs. 74 and 76) are due to be GRANTED as to all claims brought by the plaintiffs. A separate order will be entered.

DONE this 6th day of November, 2017.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE